UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| MACK A. SIMS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Cause No. 3:14-CV-1936-RLM |
| | ) |
| WARDEN, | ) |
| | ) |
| Respondent. | ) |

## OPINION AND ORDER

Mack A. Sims, a prisoner without a lawyer, filed a habeas corpus petition challenging his conviction and 35 year sentence for attempted murder by the Elkhart Superior Court on December 1, 1994, under cause number 20D01-9311-CF-104. (ECF 3.)

Mr. Sims raises one ground for relief in his petition: that his conviction must be vacated because the prosecution failed to disclose material evidence favorable to the accused before trial. He says Shane Carey, a key witness at his trial, underwent hypnosis before trial to sharpen his recollection of the events surrounding the crime, and Mr. Carey's hypnosis wasn't disclosed until years later.

## FACTS

A court deciding a habeas petition must presume the facts set forth by the state courts are correct. 28 U.S.C. § 2254(e)(1). Mr. Sims must rebut this presumption with clear and convincing evidence. Id. On direct appeal, the

Indiana Court of Appeals summarized the facts underlying Mr. Sims's conviction as follows:

> On November 2, 1993, Shane Carey was working as a security guard at Sister Virginia's Adult Basic Education Center in Elkhart. His job was to watch the parking lot and surrounding area. After reporting to work at about six p.m., he walked around the lot and then went to his car and begin reading a book. At about 7:15, Carey saw three men walking through the school lot. They walked behind the school building, then reappeared from the other end of the building and walked to some nearby apartments. A few minutes later, they approached Carey's car. As they approached, the three split up, with two walking toward the passenger side of Carey's car and the third moving toward the driver's side. That man stopped about two feet from the driver's side window, stared at Carey, and then shot him through the window. Carey was shot through the cheek and jaw. He went to the school building for help, and police and an ambulance were summoned.
> Elkhart police arrived a few minutes later. While two officers were securing the crime scene, they saw Sims behind some bushes and a dumpster along railroad tracks that run near the parking lot. Sims was wearing clothes similar to those described by Carey as worn by his assailant.
> At the hospital later that evening, Carey was shown six or seven photographs, including one of Sims taken after Sims was apprehended. Carey identified Sims's photograph as the picture of his assailant. Other testimony by Carey indicated he might have been shown a single picture of Sims before he was shown photo arrays which included Sims's picture. The same photo array was shown to Carey a day or two later, after Carey's surgery, and he again identified Sims as the man who shot him. Approximately two weeks later, Carey again picked Sims's picture out of a photo lineup.

Sims v. State, No. 20A04-9510-CR-398 (Ind. Ct. App. Aug. 9, 1996), *trans. denied*; ECF 18-1. Mr. Sims filed a motion to correct errors arguing, among other

things, that the trial court erred in allowing Mr. Carey's identification of Mr. Sims to be admitted because it was tainted by an impermissively suggestive pre-trial viewing procedure. This argument was based on Mr. Carey's testimony that he was shown a single picture of Mr. Sims rather than a photo array. The court determined that no impermissibly suggestive identification occurred.

On direct appeal, Mr. Sims argued that the trial court erred in denying his mistrial motion based on the testimony suggesting police may have shown Carey a single photo of Mr. Sims shortly after the shooting. He also argued that the trial court erred in denying his motion to correct errors based on newly discovered evidence. The Indiana Court of Appeals affirmed Mr. Sims's conviction, finding that:

> The victim had an adequate basis for his identification of Sims at trial, even if police employed an unduly suggestive photo identification procedure shortly after the shooting, and Sims did not offer credible newly discovered evidence likely to produce a different result at a new trial.

(ECF 18-1 at 7.)

Mr. Sims filed a petition for post-conviction relief in state court. That petition was dismissed without prejudice. A second post conviction relief petition was filed in 2002. At a hearing on February 8, 2012, it was revealed for the first time that Mr. Carey underwent hypnosis to improve his recollection of the events before the trial. In fact, Deputy Prosecuting Attorney Graham Polando stated that the prosecuting attorney, Charles Wicks, told him that Carey was *only* able to identify Mr. Sims after hypnosis.

3

Mr. Sims amended his petition for post-conviction to raise the issue of the State's failure to disclose Carey's hypnosis. The court held a hearing to explore the details surrounding Mr. Carey's hypnosis. The court found that Mr. Carey, the only eye witness, was hypnotized before making an in-court identification of Mr. Sims, that the hypnosis took place at the suggestion of Deputy Prosecuting Attorney (now Judge) Charles Wicks, and that it wasn't disclosed before Mr. Sims's trial. The court also found the following facts:

> 14. At the jury trial, the State presented evidence that Carey was shot by a man with a distinctive face discoloration, wearing a dark-colored, likely black three-quarter length jacket, and dark pants. The description was given as testimony by officers who first responded to the scene and who spoke to Carey before he was taken to the hospital. At the hospital Carey was presented with a lineup of pictures, and he chose Petitioner's picture;
> 15. The real dispute is to whether Carey was able to sufficiently identify Petitioner *before* hypnosis. Petitioner points to then Prosecutor Wicks' statement: that Carey was "only" able to identify Petitioner after the hypnosis. Prosecutor Wicks, however, testified during the post-conviction hearing that Carey simply became more certain in his identification following hypnosis;
> 16. At the post-conviction hearing, Carey testified that the hypnosis did indeed have some effect on his ability to recall the event, which the Court finds accords with the evidence at trial;
> 17. The Court finds that there is reason to doubt then Prosecutor Wicks' original statement that Carey was "only" able to identify Petitioner following the hypnosis. Prosecutor Wicks testified that he had not had time to consider the case before speaking with DPA Polando, but that he had consulted his notes and considered the case in preparation for his testimony at the evidentiary hearing. His sworn testimony then is more credible than his remark to Mr. Polando following an informal conversation about the case;

4

18. The Court further notes that the contention that Carey was "only" able to identify Petitioner following the hypnosis is at odds with other credible evidence as noted in the record. Lieutenant Tom Lerner with the Elkhart Police Department testified at the jury trial that, from the very beginning, Carey said he could identify his assailant, and that his description of that assailant matched Petitioner. And, the Indiana Court of Appeals noted that "at the hospital later [on] th[e] evening [of the shooting], Carey was shown six or seven photographs, including one of Sims taken after Sims was apprehended. Carey identified Sims's photograph as a picture of his assailant." This initial identification occurred *well before* hypnosis – which was confirmed through the testimony at the post-conviction hearing;

19. From the record of the case, Carey was able to identify Petitioner well before hypnosis.

(ECF 18-2 at 13-14, emphasis in original and footnotes omitted.)

Although the post-conviction court found that the hypnosis was not disclosed and that the evidence was favorable to the defense, the court denied Mr. Sims's request for post-conviction relief because it concluded that the evidence was not material. In so holding, the court noted that:

1. A Brady violation occurs when the State violates its affirmative duty to disclose material evidence favorable to Defendant. "To prevail on a Brady claim, a defendant must establish; (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." Evidence is material if there is a reasonable probability that disclosure would have changed the result in the proceeding;

2. The evidence of hypnosis was not disclosed. The Prosecutor was aware of the hypnosis; he, in fact, recommended that the state's witness receive hypnotic treatment;

3. The evidence was favorable to the defense. At minimum, the undisclosed information was impeaching evidence that would have been beneficial to the defense

5

to discredit the state's witness. The fact that the State had only one eye-witness, makes this information favorable to the defense;

    4. However, the evidence was not material, as there is not a reasonable probability that disclosure would have changed the result in the proceeding. A review of the transcript from the jury trial and testimony of Carey during the post-conviction hearing notes that Attorney Stevens undertook a vigorous cross-examination of Carey;

    5. Evidence obtained solely from hypnosis is inherently unreliable and inadmissible, denying Defendant effective cross-examination. A witness testifying as to matters recalled or remember [sic] *only* through hypnosis lacks personal knowledge and may not testify;

    6. However, testimony of a hypnotized witness may be admissible when the party forwarding the testimony provides that it has a sufficient independent basis separate from hypnosis.

    7. In this case, the State has proven that Carey could sufficiently identify his assailant prior to hypnosis. Carey noticed men walking around while he was reading his book that evening. He observed the Defendant in fair, outside lighting, who walked up to the side of this vehicle, stared at him and shot him. Carey gave a description of Defendant immediately after being shot and walking inside the school opposite for help. This description was sufficient for officers to begin searching for the culprit. Defendant was found near the scene of the crime, observing police officers. An officer identified Defendant as a suspect from the description given by Carey, relying on the three-quarter length black jacket, presented in court. After Carey was taken to the hospital, he was presented with a picture lineup, from which he identified Defendant. *Carey never identified any other as his assailant, and he was able to write a three page statement on the event.* (Emphasis mine). This is sufficient independent basis for the in-court identification;

    8. Further, although Carey admits his testimony was influenced by the hypnosis, Carey's description did not substantially change from before to after the hypnosis, and the discrepancies were fully discussed

> and tested by opposing counsel: the sole additions/changes were hair, a cap/hood, the particular color of the jacket, and more particularities on Petitioner's face. Carey's original description, as testified to by Officer Lerner at the jury trial, was "a black male, large in build with short or shaved head; described as wearing a three-quarter-length, what appeared to be black, leather jacket or coat, dark-colored pants, late twenties possibly." On cross he stated that he did not recall Carey mentioning footwear or a cap at the initial identification. In Carey's own cross he acknowledged that his initial statement to police included "black boots" which, in court, he described as combat boots. It also did not include a hood or a patch on the jacket, which he testified to in court. He also acknowledged that the discoloration on Defendant's face was not in his initial statement to police. Carey himself stated, "The information that I gave in the emergency room is the best, especially when the police first arrive at the scene. When the police first arrived at the scene, I rattled off what I saw." These minor changes in Carey's testimony were fully developed, examined and vigorously discussed in cross examination and the jury had the ability to weight Carey's credibility regarding the differences;
> 9. The evidence presented provides sufficient confidence in the verdict. The record reveals that Carey was able to identify Defendant before hypnosis. Thus the Court finds that the hypnosis disclosure would not have changed the outcome, and its nondisclosure did not amount to a Brady violation.

(ECF 18-2 at 14-16, emphasis in original and footnotes omitted.)

Mr. Sims appealed the denial of his post-conviction relief petition. The court of pppeals reviewed the findings of the post-conviction court and affirmed, holding that:

> The record supports the trial court's findings and conclusions with respect to the immateriality of the undisclosed hypnosis. Carey testified that at the time of the shooting, he looked directly into the face and eyes

7

> of his assailant. P-CR-Tr. at 66; Tr. at 224-26, 270. He described his assailant's clothing and physical characteristics to police, who apprehended Sims near the scene shortly thereafter and found his clothing and physical appearance to be consistent with Carey's description. He identified Sims three times through photo lineups/arrays shortly after the incident and before he underwent hypnosis. Although the State's nondisclosure meant that Carey was not specifically cross-examined concerning his hypnosis, he was subjected to vigorous cross-examination regarding his numerous identifications of Sims. During the post-conviction proceedings, the essence of Carey's testimony was that he remembered his assailant's appearance when he identified him by photo just after the shooting but that the hypnosis had helped him to be "extremely sure." P-CR Tr. at 60-61. To the extent that Sims now cites discrepancies in how specifically Carey described Sims's clothing or certain physical traits in his pre- and post-hypnotic identifications, he invites us to reweight evidence, which we may not do. Simply put, Carey's numerous pre-hypnotic descriptions and identifications of Sims are sufficient to establish an independent basis for his post-hypnotic in-court identification.
>
> Based on the foregoing, we conclude that the findings of fact and the record as a whole support the post-conviction court's determination that it is not reasonably probable that the outcome of Sims's trial would have been different had Carey's hypnosis been disclosed. Thus, Sims has failed to demonstrate that the post-conviction court clearly erred in denying his petition for post-conviction relief. Accordingly, we affirm.

(ECF 18-4 at 20-21.) Mr. Sims sought transfer to the Indiana Supreme Court. The Indiana Supreme Court denied transfer on October 3, 2013.

On October 27, 2014, Mr. Sims filed this federal habeas petition arguing that his conviction must be vacated because the state courts erred when they found that the non-disclosure of Mr. Carey's hypnosis was not material because

8

it is not reasonably probable that the outcome of Mr. Sims's trial would have been different had Mr. Carey's hypnosis been disclosed. On January 11, 2016, this court determined that the petition was timely.

ANALYSIS

Mr. Sims's petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997). AEDPA allows a district court to issue a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A court can grant an application for habeas relief if it meets the requirements of 28 U.S.C. § 2254(d), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be

9

> objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Woods v. Donald, 575 U.S. __, __; 135 S.Ct. 1372, 1376 (2015) (quotation marks and citations omitted). "Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Id. (quotation marks and citation omitted).

Mr. Sims argues that the post-conviction trial court erred when they found that the State's nondisclosure was not material, and that the Court of Appeals of Indiana erred in affirming that determination. "Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). To prevail on a Brady violation, three factors must be satisfied: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. See Strickler v. Greene, 527 U.S. 263, 281-282 (1999).

"[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the

proceeding would have been different." Turner v. United States, 137 S.Ct. 1885, 1893 (2017) (quoting Cone v. Bell, 556 U.S. 449, 469-470 (2009) and citing United States v. Bagley, 473 U.S. 667, 682 (1985)). "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." Kyles v. Whitley, 514 U.S. 419, 433 (1995).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

Id. at 433 (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)).

Mr. Sims's claim was adjudicated on the merits and the Court of Appeals of Indiana found that the findings of fact and the record as a whole supported the post-conviction court's determination that it wasn't reasonably probable that the outcome of Mr. Sims's trial would have been different had Mr. Carey's hypnosis been disclosed. In doing so, the court of appeals considered the holding of the Supreme Court of Indiana in Rowley v. State, 483 N.E. 2d 1078, 1081 (Ind. 1985). While evidence derived from hypnosis is inherently unreliable, where the state can demonstrate by clear and convincing evidence that an "in court identification has a factual basis independent of the hypnotic session," it is

11

admissible. The holding in Rowley is consistent with the requirements of the United States Constitution. See Biskup v. McCaughtry, 20 F.3d 245, 253-254 (7th Cir. 1995) (finding that "[t]here is no *per se* rule bottomed in the Constitution" that prohibits the use of evidence derived from hypnosis, but that constitutional values require the exercise of caution.").

The Indiana court of appeals correctly set out the applicable legal standards. The court of appeals noted that Carey had both described and identified his assailant several times before being hypnotized. The court of appeals noted that those descriptions and identifications supported the post conviction relief court's finding that there was an independent basis for the in court identification that occurred after Mr. Carey's hypnosis. The court of appeals also considered Mr. Carey's testimony in the post conviction relief hearing that he remembered his assailant's appearance, but hypnosis helped him be "extremely sure" about his identification of Mr. Sims. The court of appeals also noted the location of Mr. Sims in relationship to the crime, and noted that he was apprehended shortly after the crime occurred. From these things, the court of appeals concluded that the post conviction relief court's determination that even if Mr. Carey's hypnosis had been disclosed pre-trial, it is not reasonably probable that the outcome would have been different. The Indiana court of appeals' decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1).

Neither did the State court's adjudication of the claim result in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(2). According to Mr. Sims, the state never demonstrated any factual basis independent of the hypnotic session for Mr. Carey's in-court identification of him. Mr. Sims argues that both the post conviction relief court and the court of appeals erred because their rulings were based on a finding that Mr. Carey was able to identify Mr. Sims before hypnosis; Mr. Sims says the record doesn't support this finding. He notes that the hypnosis was suggested because Mr. Carey was struggling with clearly identifying Mr. Sims, and that Mr. Carey's earliest identifications of Mr. Sims were equivocal. Mr. Sims points out that, when the earliest of Mr. Carey's identifications occurred in the hospital, Mr. Carey testified that he had glass in his eye, and that Mr. Carey testified that he could see after the glass was removed. Mr. Sims also points to Mr. Carey's trial testimony suggesting that he was shown a single photograph of Mr. Sims at the hospital. Mr. Sims also points out that some of the arguably most compelling identification testimony at trial referenced a birthmark that, after hypnotism, "really stood out" to Carey. Nonetheless, Mr. Sims hasn't produced clear and convincing evidence that overcomes the presumption that the state court's findings of fact are correct, and this court has no authority to reweigh the evidence. Mr. Sims can only prevail here if the state's determination of the facts in light of the evidence presented was unreasonable. 28 U.S.C. § 2254(d)(2). The factual determinations of the post

13

conviction relief court, later affirmed by the court of appeals, are not unreasonable.

Criminal defendants are entitled to a fair trial but not a "perfect" one. Rose v. Clark, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be "objectively" unreasonable. Wiggins v. Smith, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of that decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quotation marks omitted). Mr. Sims hasn't met this burden. Reasonable jurists might disagree as to whether (or to what extent) the hypnosis impacted Mr. Carey's testimony or the decision making process of the jury. But fairminded disagreement is not a basis for habeas corpus relief. Indeed, fairminded disagreement precludes habeas corpus relief. Id. The habeas corpus petition must be denied.

## Certificate of Appealability

Under Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve

14

encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000). While this court has ruled against Mr. Sims, the facts of this case are troubling, and the implications of Mr. Carey's hypnosis on his trial testimony and the jury deliberations are difficult to quantify. In this case, even if no jurist would reach a different conclusion, reasonable jurists could debate whether the post conviction relief court erred in finding that the prosecutor's failure to disclose evidence of Mr. Carey's hypnosis was not material under Brady. Accordingly, a certificate of appealability will issue in this case. For the same reasons, Mr. Sims may appeal in forma pauperis.

## CONCLUSION

For these reasons, the court DENIES habeas corpus relief; GRANTS a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; GRANTS leave to appeal in forma pauperis pursuant to 28 U.S.C. § 1915(a)(3); and DIRECTS the clerk to enter judgment in favor of the respondent and against the petitioner. Additionally, the clerk is DIRECTED to edit the docket to change the respondent to Warden pursuant to Indiana Code § 11-8-2-7.

SO ORDERED.
ENTERED: February 6, 2018.

    /s/ Robert L. Miller, Jr.
    Judge
    United States District Court